UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GRACE HOEBER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:15-CV-1031 (CEJ) |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. **Procedural History**

On January 28, 2013, plaintiff Grace Hoeber protectively filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of September 1, 2012.[1] (Tr. 156-62, 181). After plaintiff's application was denied on initial consideration (Tr. 77-90), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 102-03).

A hearing was held by video on February 27, 2014. (Tr. 29-76). The ALJ issued a decision denying plaintiff's application on March 7, 2014. (Tr. 8-27). The Appeals Council denied plaintiff's request for review on May 5, 2015. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

### II. **Evidence Before the ALJ**

#### A. **Disability Application Documents**

---

[1] Plaintiff had prior applications for benefits filed on May 23, 2012, with an alleged date of onset of January, 19, 2009. The applications were denied on September 10, 2012. (Tr. 78, 180).

In a Disability Report dated February 14, 2013 (Tr. 184-92), plaintiff listed her disabling conditions as scoliosis, carpal tunnel, chronic back problems, arthritis, asthma, anxiety, chronic knee problems, depression, and nerve damage. She reported that she stopped working on August 27, 2008, due to her conditions. She attended special education classes throughout her school years. She had previously worked in a customer service position in retail, as a housekeeper and laundry attendant in a motel, and as a sandwich maker and cashier at a sandwich shop. Plaintiff did not list any medications in her Disability Report.

In a Function Report dated March 10, 2013, (Tr. 205-12), plaintiff stated that she lived in a hotel room with her boyfriend. In response to a question about her daily activities, plaintiff stated that she cleaned her residence and tried to stay busy with cleaning and laundry, although it took her a long time to complete chores. Her arthritis made it difficult to use her hands or stand or walk for a long time. She was not able to sleep during the night "at all" due to pain all over her body. She prepared sandwiches to eat. She was able to go out alone and did so whenever she was able to walk. She shopped for food and clothes. She did not drive but was able to take a bus. She was able to pay bills and count change, but could not manage a checkbook, money orders, or savings account. She used to enjoy fishing, cleaning, cooking, music and shopping, but suggested she did not do so anymore due to headaches and pain in her back, legs, sides, and hands. She spent time with others at the store or church or on the telephone. Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, seeing, understanding, following instructions, using her hands, and getting along with others. She could walk 5 to 10 minutes before needing to rest for 10 to 15 minutes. She could pay

attention for 5 to 10 minutes and could not finish things she started. She also had a lot of trouble with reading and spelling and sometimes had trouble following spoken instructions. She did not always get along with authority figures but had never been fired because of conflict with others. She could not handle changes in routine or stress.

Randy Carter, plaintiff's boyfriend, completed a third-party Function Report that was generally consistent with plaintiff's report. (Tr. 194-201). In addition, he stated that plaintiff woke up at 6:00 in the morning and spent her day compulsively cleaning. She collected dolls and liked to go to thrift stores. According to Mr. Carter, plaintiff found it hard to understand "most things" and was almost always unable to finish something she started. She used to be able to drive a car and previously had better comprehension and the ability to read. It seemed to him that she was losing her independence. She sometimes had trouble getting along with her mother and was better able to get along with authority figures when she could work. She did not like changes in routine and liked to plan her actions.

### B. <u>Testimony at Hearing</u>

Plaintiff was 44 years old at the time of the hearing. (Tr. 33). She testified that she and her boyfriend lived in a hotel room. (Tr. 51). Her Medicaid benefits had been terminated about two months before the hearing and she was trying to reach her caseworker to get them restored. (Tr. 56). She received special education services throughout her schooling. She initially testified that she last worked in 2008 as a sandwich maker and cashier at a fast-food restaurant. (Tr. 34). She held this job for three years before she was incarcerated for four years. (Tr. 34-35). Her prior jobs included working as a cashier at a thrift store and

working at a laundromat, where she did customers' laundry and cleaned the store. While incarcerated, she initially worked in the kitchen but experienced too much pain in her legs and hands and was reassigned to operate a sewing machine. (Tr. 58). Later in the hearing, she testified that she had just begun working 10 to 15 hours a week as a cashier at a dollar store.[2] (Tr. 59-60). She explained that she loved dealing with customers and liked to work. (Tr. 56).

Plaintiff testified that chronic arthritis caused pain in her back, legs, knees, hands and wrists. (Tr. 38). She rated her back pain at level 10 on a 10-point scale, and stated she experienced such pain "all day" because she was "constantly moving [and] doing something." (Tr. 39). She also experienced a lot of pain in her legs and knees when walking or standing. She could walk for 10 to 15 minutes before needing to rest for 10 to 15 minutes. (Tr. 40, 43). She could stand for about 10 minutes before needing to sit for about 20 minutes. (Tr. 44). When sitting, she had tingling and tightening throughout her legs and had trouble bending her knees. (Tr. 40). She experienced pain in her hands and wrists when lifting or sweeping. Prioer carpal tunnel release surgery failed to resolve the pain. (Tr. 59). She had been prescribed splints to wear on her wrists but had lost them when moving. (Tr. 42). When she could not "stand it anymore," she took medication and lay down for a couple of hours. (Tr. 39). Despite the pain, her physical conditions were rarely so bad that she "can't do anything." She tried to get out of the hotel every day to walk and get some air. (Tr. 52). She took her medication with her to work at the dollar store and used it if she experienced pain. She had received her manager's approval

---

[2] The ALJ determined that plaintiff's work at the dollar store did not qualify as substantial gainful activity. (Tr. 13)

to not overfill customers' shopping bags so that she could lift them more easily. (Tr. 61).

Plaintiff used two inhalers for her asthma, which was aggravated by allergies and the fact that she smoked half a pack of cigarettes a day. (Tr. 44-45). She had succeeded in reducing her daily smoking from two packs and wanted to quit completely.

Plaintiff also had depression, for which she had been taking medication since her release from prison. (Tr. 46). Her symptoms included wanting to avoid others and "throwing fits" all the time. Medication helped but she still had 5 or 6 bad days a month. When asked to describe her most recent "fit," she stated that she had come back to the hotel room the day before and found her boyfriend and others rolling marijuana. She threw a fit because she didn't want any drugs around her. (Tr. 59). She also became angry if she was concerned by something affecting her grandchildren. (Tr. 60). She had no difficulty getting along with her co-workers at the store and asked for her manager's assistance whenever a customer had a complaint. (Tr. 62).

Plaintiff had difficulty concentrating and remembering to do things. (Tr. 48). She could follow spoken instructions if she completed the task right away. When following written instructions, she often had to ask for verbal clarification. (Tr. 49). She had difficulty completing tasks because she became distracted. She stated that she could watch television for about 10 or 15 minutes before she had to get up and start moving around. (Tr. 49-50). She had been told that she had a learning disability but did not know the specific areas of difficulty.

Plaintiff testified that she slept about three or four hours a night. She napped for two or three hours about two or three times a week. (Tr. 48). Plaintiff testified that she got up about 5:00 in the morning and swept the rug, cleaned the bathroom, and made the bed. These chores took her 45 minutes to an hour to complete. (Tr. 51). Options for cooking were limited in the motel room and she prepared microwave meals.

Vocational expert James Breen testified that plaintiff's past work as a sandwich maker, laundry worker attendant, and cashier, were all performed at the light level. (Tr. 63-74). Mr. Breen was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience. (Tr. 65). In addition, the ALJ asked him to assume that the hypothetical individual could perform work in the light exertional range, with occasional postural activities, and use both hands on a frequent basis for gross and fine manipulation. In addition, the hypothetical individual should avoid concentrated exposure to pulmonary irritants, and was limited to work that was unskilled, simple, routine, and repetitive. Finally, the individual learned best by demonstration or with oral instruction aided by demonstration. Mr. Breen testified that such an individual would be able to perform all of plaintiff's past relevant work. (Tr. 66). The additional requirement to avoid teamwork tasks precluded plaintiff's past job as a sandwich maker, but other jobs were available in the local and national economy, including mail clerk, hotel housekeeper, and cashier. (Tr. 67). Restricting the individual to sedentary work eliminated all past relevant work, but other available jobs included circuit board tester, importer clerk, and charge account clerk. No

competitive work would be available if the individual also needed to nap two or three hours a day, two or three times each work week. (Tr. 68).

## C. <u>Relevant Medical Records</u>

The Court has reviewed all the medical records contained in the administrative record. The parties do not dispute the ALJ's determination that plaintiff had the severe impairments of depression, asthma, obesity, degenerative disc disease of the cervical and lumbar spine, history of bilateral carpal tunnel syndrome, and right knee joint effusion and compartment. (Tr. 14). The sole issue raised by plaintiff's appeal is whether the ALJ erred in determining that plaintiff functions in the borderline intelligence range and does not meet the requirements of Listing 12.05C, governing intellectual disability, formerly labeled as "mental retardation." Accordingly, the Court's recitation of the medical evidence is limited to records relevant to plaintiff's intellectual functioning.

A mental health evaluation was completed upon plaintiff's intake to the Missouri Department of Corrections. (Tr. 275). Plaintiff was determined to be within normal limits for memory, concentration, intellect, directed thought, and reality testing, and she was oriented as to person, place, date, and event. No deficits or abnormalities were noted with respect to plaintiff's speech, motor activity, mood and affect, eye contact, cooperation, judgment or insight. She listed reading as a method for coping with feelings of anxiety and anger. (Tr. 276). During her incarceration she participated in various classes, and was described as attentive, interactive, and participating well. It was noted that she made "every effort to understand [the] material." Although she had "limited educational abilities," she asked for help and was very motivated and interested. (Tr. 280).

Sherman Sklar, M.E., completed a psychological evaluation of plaintiff on August 21, 2012. (Tr. 417-23). At that time, plaintiff was living in a house with her fiancé and his mother. Plaintiff was cooperative, responsive, open, spontaneous, coherent, relevant, and logical. She spoke at a normal pace and provided good detailed information regarding her life. Her chief complaints were that she had sleep problems, felt depressed, and had a learning disability with reading and comprehension deficits. Prescription medications for sleep and depression were not helpful. Plaintiff stated that she became very upset and angry when thinking about the circumstances that led to her incarceration and its collateral consequences. The examiner described her as more angry than depressed. Her daily regimen included doing some cooking, helping with housework, and going grocery shopping. She liked to fish, go for walks, and hang out at the mall. Mr. Sklar noted no difficulties with plaintiff's social functioning.

Mr. Sklar noted that plaintiff was well-oriented to person, place, and time. She could recall five of six digits. She could identify only the current president, and did not know the identities of the current mayor of St. Louis and governor. She knew her social security number, birth date and birth place, and was able to do basic math problems without difficulty. Mr. Sklar found that plaintiff's responses to cognitive questions indicated deficits in her general information and abstract reasoning abilities. Although plaintiff reported that she had problems with her ability to focus, this was not observed during the evaluation. Indeed, the examiner described plaintiff as "quite persistent" in her efforts on the intelligence test and "trying hard to come up with reasonable solutions." (Tr. 420).

Mr. Sklar administered the Weschler Adult Intelligence Scale — IV (WAIS-IV), and determined that plaintiff's Full Scale IQ was 70, which placed her in the borderline range of intelligence. Her scores on scales measuring perceptual reasoning, working memory, and processing speed fell within the borderline to low average ranges, while her score on the verbal comprehension index — 63 — was in the mild mentally retarded range. Mr. Sklar opined that, "[t]hese index scores are quite variable and indicative of a learning disability with her weakest area being in processing verbal constructs and her greatest strengths in holding and manipulating numbers in her head and executing tasks at a rapid pace." (Tr. 421). He further found that "[h]er main strength is in her ability to rapidly process[] information. A learning weakness is in her abstract reasoning, her knowledge of words and her fund of general information." Id. Mr. Sklar diagnosed plaintiff on Axis I with adjustment disorder, unspecified, acute; and on Axis II with borderline intellectual functioning and learning disorder, not otherwise specified. Mr. Sklar assigned a Global Assessment of Functioning score of 67.[3]

Mr. Sklar concluded that, "In summary, Ms. Hoeber has a history of learning disability and has been the recipient of special education services throughout her school career." He further noted that she "served four years in jail and is quite angry about this occurrence. She has a very hard time letting go of her anger and the fact that she now [faces] significant obstacles in her efforts to resume a normal life. She is taking some mood changing medication with little help." (Tr. 421-22). Mr. Sklar opined that plaintiff was capable of managing her own funds. (Tr. 422).

---

[3] A GAF of 61-70 corresponds with "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

On April 12, 2013, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique. (Tr. 81-83). Dr. DeVore concluded that plaintiff met the criteria for organic mental disorders (borderline intellectual functioning) and affective disorders (depression). He found that she had mild restrictions in the activities of daily living, no restrictions in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. She had no episodes of decompensation. In support of his findings, Dr. DeVore noted that plaintiff completed her Function Report without help; did not require reminders to take medication; was able to clean, launder, and cook; went out on her own; shopped; and spent time with others. Her learning disorders and borderline intellectual functioning did not severely restrict her functioning.

### III. The ALJ's Decision

In the decision issued on March 7, 2014, the ALJ made the following findings with respect to plaintiff's application for disability insurance benefits:

1. Plaintiff last met the insured status requirements of the Social Security Act on March 31, 2013.

2. Plaintiff did not engage in substantial gainful activity from her alleged onset date of September 1, 2012, through her date last insured of March 31, 2013.

3. Through the date last insured, plaintiff had the following severe impairments: depression, borderline intellectual functioning, asthma, obesity, degenerative disc disorder of the cervical and lumbar spine, history of bilateral carpal tunnel syndrome, and right knee joint effusion and patellofemoral compartment osteoarthritis.

4. Through the date last insured, plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Through the date last insured, plaintiff had the residual functional capacity to perform the light work as defined in 20 C.F.R. §

404.1567(b), limited to only occasional postural activities, and only frequent use of her hands for gross and fine manipulation. In addition, she was required to avoid concentrated exposure to pulmonary irritants. She was also limited to unskilled work that is simple, routine, and repetitive. Finally, she learned best by demonstration or oral instruction with added demonstration if necessary.

6. Through the date last insured, plaintiff was able to perform her past relevant work as a housekeeper, sales clerk and sandwich maker. This work did not require work-related activities precluded by plaintiff's residual functional capacity. In the alternative, considering plaintiff's residual functional capacity, age, education, and work experience, plaintiff could also perform work as a mail clerk, housekeeper, and cashier.

7. Plaintiff was not under a disability within the meaning of the Social Security Act from September 1, 2012, through March 31, 2013.

(Tr. 13-23).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or

mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. **Discussion**

Plaintiff argues that the ALJ improperly assessed whether she met the requirements of Listing 12.05C.[4] To meet the requirements of the Listing, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

The ALJ explained that:

---

[4] Listing 12.05 states in relevant part:

Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.

* * *

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

-14-

the "paragraph C" criteria of Listing 12.05 were not met because the claimant did not have a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. In 2012, testing determined a verbal IQ of 63 and full scale IQ of 70. However, these are the only IQ scores in the record, and they are the result of a recent examination. Moreover, the IQ test evaluator failed to provide an explanation as to whether or not these test results appear valid. Indeed, the claimant has previously been able to learn and perform jobs above the level of substantial gainful activity, and there is no indication of any injury or other condition that would have worsened her intellectual functioning.

(Tr. 16).

Plaintiff argues that the ALJ improperly rejected her IQ scores, which led to a failure to consider whether the onset of her intellectual impairment was prior to age 22. Plaintiff also argues that the ALJ's finding that she does not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function" is plainly incorrect in light of the ALJ's finding at step 2 that plaintiff has severe impairments. The Commissioner does not dispute that plaintiff meets the third element of the Listing.[5]

"An ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior." Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001). "Indeed, test results of this sort should be examined to assure consistency with daily activities and behavior." Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998) (citation omitted). On review the Court must affirm the ALJ if "the decision to disregard [plaintiff's] scores as unreliable is supported by substantial evidence on the record as a whole." Id.

---

[5] The Commissioner asserts that the ALJ was merely paraphrasing the Listing requirements and did not make a finding that plaintiff did not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."

The Court concludes that the ALJ's decision to disregard plaintiff's IQ scores is supported by substantial evidence in the record. First, the examiner described plaintiff's IQ scores as "quite variable and indicative of a <u>learning disability</u>."[6] (Tr. 421) (emphasis added). And, he did not diagnose her with mental retardation, but borderline intellectual functioning, which is defined as an IQ in the 71–84 range, and thus outside Listing 12.05C's range. See American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 39–40, 684 (4th ed. 1994). Furthermore, he assigned plaintiff a GAF of 67, which is indicative of only mild symptoms. The ALJ also addressed plaintiff's activities of daily living and social functioning. Based on her abilities to manage her personal care, prepare simple meals, go shopping, use public transportation, work part-time, and effectively cope with argumentative customers, the ALJ found that plaintiff had only mild restrictions in performing the activities of daily living and social functioning. (Tr. 15). Plaintiff does not dispute these findings.

Plaintiff challenges the ALJ's reliance on the fact that Mr. Sklar did not affirm that the scores were valid, because he did not state that they were invalid. An examiner's silence with respect to the validity of IQ scores is not meaningless, however. The regulations state that, "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(d)(6). Plaintiff also argues that relying on Mr. Sklar's diagnosis and GAF score to affirm the ALJ's finding amounts

---

[6] The ALJ addressed plaintiff's learning disabilities by limiting her to simple, routine, and repetitive unskilled work.

to an impermissible *post hoc* rationalization because the ALJ herself did not cite these as reasons for disregarding her IQ scores. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; . . . an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself."). Notwithstanding this general rule against *post hoc* rationalizations, in the context of Social Security disability determinations, "[t]here is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011) (citation omitted); see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974) ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Here, the ALJ's conclusion is amply supported by the record.

Because the Court concludes that the ALJ did not err in determining that plaintiff's IQ scores do not satisfy the first prong of Listing 12.05C, the Court declines to address plaintiff's arguments directed to the second prong.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate judgment in accordance with this Memorandum and Order will be entered.

                                                                                     _____
                                                                                     CAROL E. JACKSON
                                                                                     UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2016.